# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 17-cv-6857 (RJS)

KOREAN AMERICAN ASSOCIATION OF GREATER NEW YORK, INC.,

Plaintiff,

VERSUS

SUNG KI MIN,

Defendant.

OPINION AND ORDER
January 3, 2020

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiff Korean American Association of Greater New York, Inc. ("KAAGNY" or "the Association") brings this action for breach of contract, breach of fiduciary duty, and conversion against its former president, Sung Ki Min ("Min"), alleging that Min mismanaged KAAGNY's assets during his time as president and in the year following his impeachment in March 2015 when he continued to hold himself out as president, before his successor, Minsun Kim ("Kim"), assumed office. Having presided over a bench trial in this case, the Court now issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court concludes that KAAGNY has satisfied its burden on each of its claims and is entitled to damages in the amount of $369,095.56.

I. PROCEDURAL HISTORY

KAAGNY filed its Complaint on September 7, 2017, asserting three claims under New York state law: breach of contract, breach of fiduciary duty, and conversion. (Doc. No. 1 ("Compl.").) KAAGNY alleged that (1) Min breached his contractual obligation to satisfy KAAGNY's outstanding debt of approximately $300,000, using his personal finances if necessary, before leaving office; (2) Min breached his fiduciary obligations as KAAGNY president and de facto president by mismanaging KAAGNY's finances; and (3) Min unlawfully converted $191,172 in funds that KAAGNY maintained in two Chase Bank

accounts to pay for personal expenses and to fight his impeachment from office. (*Id.* at 5–8.) Min filed his Answer on November 22, 2017. (Doc. No. 22.)

On June 4, 2018, the case proceeded to a two-day bench trial, which was conducted in accordance with the Court's Individual Rules for non-jury proceedings. Specifically, the parties submitted affidavits containing the direct testimony of their respective witnesses, as well as copies of all exhibits they intended to offer as evidence. The parties were then invited to call those witnesses whom they wished to cross-examine at trial. In all, three witnesses – Kim, Min, and KAAGNY Director and Vice President Sarah Kim-Beague ("Kim-Beague") – submitted affidavits and testified before the Court. The parties submitted written summations on June 19, 2018. (Doc. Nos. 61, 62.) KAAGNY responded to Min's summation on June 25, 2018 (Doc. No. 63), and Min responded to KAAGNY's summation on June 26, 2018 (Doc. No. 64).[1]

## II. LEGAL STANDARD

To prevail on its claims, KAAGNY was required to present evidence in support of the allegations set forth in its Complaint (as narrowed or focused in summation), and to prove those allegations by a preponderance of the evidence. *See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence . . . ." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (internal quotation marks omitted). As the finder of fact, the Court is entitled to make credibility findings as to the witnesses and their testimony. *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

## III. FINDINGS OF FACT[2]

### A. Background and KAAGNY Bank Accounts

KAAGNY is a New York-based non-profit organization that "represents the interests of Korean-American immigrants, helps them assimilate and integrate into the United States, and provides a common network for the Korean-American community throughout the tri-state area." (Stip. Facts ¶ 1; *see* Affidavit of Minsun Kim ("Kim Aff.") ¶ 3.) KAAGNY represents more than 500,000 Korean-American residents and 200,000 professional, religious, educational, and trade organizations throughout the region, and is the most prominent Korean-American non-profit recognized by the President of the Republic of Korea. (Kim Aff. ¶ 3.)

KAAGNY's principal asset is its building at 149 West 24th Street in Manhattan (the "KAAGNY building"). (*Id.* ¶ 16.) Building-related expenses such as property taxes are paid out of a bank account that KAAGNY maintains at Chase Bank

---

[1] In its summation briefing, KAAGNY narrowed its conversion claim by arguing that Min converted only $70,000 from one of KAAGNY's bank accounts, rather than $191,172 from both accounts. (Doc. Nos. 62 at 14–15; 63 at 2–4.) *See, e.g., Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (finding claim abandoned where plaintiff failed "to argue the claim in its post-trial memo or in its response papers once [the defendant] had addressed [it]"), *aff'd*, 32 F.3d 690 (2d Cir. 1994).

[2] The Court's factual findings are taken from the parties' May 2, 2018 Stipulation of Facts (Doc. No. 41 at 1–2 ("Stip. Facts")), the trial transcript (Doc. Nos. 65, 67 ("Tr.")), witness affidavits (Doc. Nos. 58–60), KAAGNY's exhibits ("PX"), and Min's exhibits ("DX"). To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

(account number xxxx0206) (the "building account"); in addition, KAAGNY maintains a separate Chase account for operating expenses (account number xxxx5517) (the "operating account"). (*Id.* ¶ 17; PX7.)

KAAGNY's lease of the building generates approximately $40,000 in rent each month, which goes directly into the building account to cover building-related expenses. (Tr. 165:7–13.) By contrast, funds in the operating account are generated from non-building-related sources such as "membership fee[s], Board of Director fee[s], . . . advertisements, . . . government[] support, and business income" (PX1 at 31), as well as community fundraising or, in certain circumstances, the KAAGNY president's personal funds (Tr. 48:1–3, 77:17–78:2). In the event that rental income in the building account is insufficient to pay KAAGNY's building-related expenses, the KAAGNY president may also use community fundraising or personal funds to cover such expenses. (Tr. 48:5–11.)

The parties dispute whether, and in what circumstances, building account funds may be transferred to the operating account or otherwise used to pay operating expenses. KAAGNY's written bylaws ("the Bylaws"), as revised on March 11, 2013 and translated into English, do not expressly speak to this issue, providing obliquely that "[t]he operation of the [KAAGNY] Building must be done on a self-financed basis." (PX1 at 37 (Article 89); *see also id.* at 31 (Article 76(2)) ("The finance whose purpose is determined may not be used for other purposes.").) According to Kim, however, a well-recognized custom prohibits KAAGNY presidents from using building account funds to pay for operations. Kim testified that all KAAGNY presidents and the broader KAAGNY community "clearly understand" that "[b]uilding fund[s] cannot be transferred to [the] operati[ng] account and . . . must be used for only building purpose[s]." (Tr. 46:19–23; *see also* Tr. 92:9–12 (Question: "[A]s far as you know, other than Mr. Min, has any other person in charge of KAAGNY moved building money to the operating account to pay ordinary expenses?" Kim: "No.").)

When the Court asked Min if, "[a]s the president of the [A]ssociation, [he had] an understanding [as] to whether it was permissible to use the building account funds to cover expenses related to something other than the building," Min responded, "[i]t's not that it's permissible, but as a custom, customarily the money was taken from [the building account], it was used and then it was replenished." (Tr. 149:12–18.) Min later clarified, however, that he had "heard" that past presidents had used building account funds for operating expenses only in "emergency situation[s]." (Tr. 152:5–22.) Moreover, when the Court asked Min to state on the record who had told him that it was an acceptable custom to use building account funds to pay for operating expenses, Min was evasive and initially declined to answer the question; in fact, he only responded when faced with contempt sanctions. (Tr. 154:6–19.) In light of the witnesses' testimony and demeanor at trial, the Court credits Kim's statement that a well-recognized custom generally prohibited KAAGNY presidents from using building account funds for operating purposes. Although a limited exception may have existed for emergency situations, even then, past presidents would replenish the building funds after using them. To the extent Min testified that any such exception was commonly invoked, the Court does not credit Min's testimony. Indeed, Min's testimony as to the permissible use of building account funds is belied by his evasive answers when questioned as to his sources of information, suggesting that Min

3

knew the use of building account funds for operating purposes was generally improper.

B. The KAAGNY Presidency and Election Process

The KAAGNY president serves a two-year term that begins on May 1st of every odd-numbered year and ends on April 30th of the following odd-numbered year. (Kim Aff. ¶¶ 5, 7.) Although the KAAGNY presidency is a "very honorable and prestigious position" in the Korean-American community (Tr. 60:14–15), it does not come cheap. To run for president, a candidate must pay a $100,000 election registration fee and promise that, if elected, the candidate will comply with rigorous – and, as this case demonstrates, perhaps risky – financial obligations set forth in the Bylaws. (See Kim Aff. ¶¶ 10–15, 23; PX2, 4; Tr. 26:6–7.)

Specifically, each candidate in the 2013 KAAGNY presidential election was required to sign a pair of affidavits (the "2013 Affidavits"). (PX2; see Kim Aff. ¶¶ 11, 14, 23.) The first affidavit, titled "Financial Assurance Note," provided that, in the event the candidate was elected president, the candidate and his or her spouse would be responsible for "all expense[s] incurred by KAAGNY during the president's term as determined by the KAAGNY By-Laws," and that "in the event [such] financial responsibilities are not discharged," the candidate and his or her spouse would "remain financially liable even after the end of [the candidate's] term" as president. (PX2 at 2.) The relevant Bylaws referenced in the affidavit include Article 69 (titled "Financial Guarantor"), which provides in relevant part that "[t]he winner of the Presidential Election . . . is responsible for all the running expenses that occur during his or her Presidency." (PX1 at 27–28.) Similarly, Article 76 (titled "Finance") provides that "[t]he President of the Association is responsible for all the running expenses that occur during his or her term, and the running expenses during his or her term cannot be transferred to the next fiscal year unpaid." (Id. at 31.) As Kim testified at trial, these financial obligations made an outgoing KAAGNY president and his or her spouse personally responsible for any debt left on KAAGNY's books at the end of the presidency. (Tr. 75:10–78:18; see also PX38 at ¶ 39 (July 17, 2015 Affidavit of Sung Ki Min, Case No. 15-cv-3370 (RJS)) ("I – as President – remain personally responsible for any deficit in operating funds.").)

The second affidavit, titled "Assurance Promissory Note for the Financial Liabilities of the Building," set forth similar financial obligations concerning the KAAGNY building. In particular, each candidate pledged:

> I . . . confirm and agree that in the event I am elected and I take the office as the 33rd KAAGNY president that all financial liabilities incurred by the KAAGNY [b]uilding during the president's term as determined by the KAAGNY By-Laws shall be the responsibility of myself and assure by notarized signature that I shall be civilly responsible for financial liabilities of the KAAGNY building.

(PX2 at 5.)

Finally, candidates in the 2015 KAAGNY presidential election were required to sign an additional affidavit ("2015 Affidavit"), which expressly barred the successful candidate from transferring debt to his presidential successor, providing as follows:

4

I . . . will undertake any and all financial liabilities of KAAGNY office, in the event the Candidate wins and is declared as 34th President of [KAAGNY] and produces any financial liabilities during the presidency according to the By-Laws of KAAGNY Chapter 12 Article 69 in which it is specified that the financial liabilities from the Secretariat of KAAGNY shall not be transferred to the next presidency.

(PX4.) As a candidate in both the 2013 and 2015 presidential elections, Min signed each of the above affidavits (collectively, the "Campaign Affidavits"). (Kim Aff. ¶¶ 23, 27; PX2, 4.)

C. Min and Kim

Min first became involved with KAAGNY in 2003. (Affidavit of Sung Ki Min ("Min Aff.") ¶ 5.) Before being elected president in 2013, Min was a General Secretary of the Association and the Vice Chairman of the Board of Directors. (Id. ¶ 6.) In March 2013, Min was elected as the 33rd president of KAAGNY, with a term scheduled to end on April 30, 2015. (Id. ¶ 7.)

In December 2014, Kim announced her candidacy to become KAAGNY's 34th president. (Kim Aff. ¶ 24.) Min also sought reelection, however, and in early February 2015, both he and Kim paid the $100,000 election registration fee, signed the 2015 Affidavit, and received approval as the only two presidential candidates. (Kim Aff. ¶¶ 25–27, 29; PX4; Tr. 25:18–26:7.) Over the following year, Kim and Min engaged in a back-and-forth struggle for the KAAGNY presidency.

The opening salvo came on February 21, 2015, when KAAGNY's Election Oversight Committee disqualified Kim from running in the election – which was scheduled to be held only two weeks later – based on a newly-promulgated KAAGNY rule prohibiting candidates from engaging in certain campaign activities. (Kim Aff. ¶ 30.) On March 5, 2015, Kim filed a petition pursuant to Article 78 of the New York Civil Practice Laws and Rules in New York state court contesting her disqualification. (Id. ¶ 32.) *See Kim v. Korean Am. Ass'n of Greater N.Y., Inc.*, No. 100386/2015, 2016 WL 762687, at *1 (N.Y. Sup. Ct. Feb. 16, 2016). When the court failed to rule by election day, March 8, 2015, Min ran unopposed and was elected as president for another term, to run from May 1, 2015 through April 30, 2017. (Kim Aff. ¶ 31; Min Aff. ¶ 23.)

On March 14, 2015, less than a week after the election, the KAAGNY Former Presidents Advisory Committee ("FPAC") called a "Special General Meeting," to be held on March 31, 2015, for the purpose of impeaching Min. (Kim Aff. ¶ 33.) Although Min initially filed a motion in state court to enjoin the meeting from being held, he ultimately withdrew that motion. (Id. ¶¶ 34–35.) At the Special General Meeting, the FPAC determined that the March 8, 2015 election was improper, and impeached Min. (Id. ¶ 36.) A new election process was scheduled, and on April 26, 2015, Kim was elected president. (Id. ¶ 37.) *See also Kim*, 2016 WL 762687, at *1–3.

Min, however, refused to recognize his impeachment or Kim's subsequent election, and would not vacate the KAAGNY offices. (Id. ¶ 38.) Instead, on April 30, 2015, Min commenced a separate action – on behalf of the only named plaintiff, KAAGNY – in this Court against Kim for wrongfully holding herself out as president. *Korean Am. Ass'n of Greater N.Y., Inc. v. Kim*, 15-cv-3370 (RJS) (S.D.N.Y. April 30, 2015), ECF No. 1 (Complaint); PX36. (*See also* Kim Aff.

¶ 42.) Kim, in turn, sought relief in her ongoing state-court Article 78 proceedings – specifically, "a declaration that [she] was properly elected and an order directing Min, having been impeached, to vacate the KAAGNY offices and relinquish control of the books and records." (Kim Aff. ¶ 44.) On February 16, 2016, the New York state court ruled in Kim's favor and ordered Min to relinquish control of KAAGNY, and this Court subsequently dismissed Min's related federal action. *See Korean Am. Ass'n of Greater N.Y.*, 15-cv-3370 (RJS) (S.D.N.Y. Mar. 3, 2016), ECF No. 44; *Kim*, 2016 WL 762687, at *12. (*See also* Kim Aff. ¶¶ 45–47.) Min vacated the KAAGNY premises on March 21, 2016, at which point Kim took over as president. (Tr. 38:17–22; 85:7–10.)

### D. KAAGNY's Finances

Upon taking control as president, Kim discovered that Min had left KAAGNY with only $2,644.34 in the building account, $1,814.84 in the operating account, and approximately $300,000 in debts and liabilities. (Affidavit of Sarah Kim-Beague ("Kim-Beague Aff.") ¶¶ 8, 9, 19; PX9, 31.)

With respect to the building account – which, it bears repeating, received $40,000 in rent each month – Min transferred a total of $302,957.37 in building account funds to the operating account through a series of fifty-four wire transfers between July 2014 and January 2016. (*See* PX7 at 91, 126, 157, 171, 199, 223, 237, 251, 265–66, 279–80, 295, 309, 321, 333–34; *see also* Kim-Beague Aff. ¶¶ 23–36.) In addition to the $302,957.37 that he transferred to the operating account, Min paid lawyers a total of $70,000 directly from the building account to represent him in connection with the impeachment and Article 78 proceedings: $20,000 to Marc S. Bresky of the Bresky Law Firm, PLLC on March 20, 2015; $20,000 to Steptoe & Johnson on April 9, 2015; $10,000 to Steptoe & Johnson on April 13, 2015; and $20,000 to the Blackstone Law Group on March 3, 2016. (Kim Aff. ¶¶ 57–62; Kim-Beague Aff. ¶¶ 38–41 (citing PX17–19, 23).)

As for the operating account, the parties do not dispute that most of the withdrawals and transfers from this account (set forth in full in PX7) relate to bona fide operating expenses. The disputed payments include approximately $60,000 to pay for a gala held on January 13, 2015 (Tr. 161:12–162:19; 185:15–23), and $20,750 for dinners in March and June of 2015 (Kim Aff. ¶¶ 65–66; Kim-Beague Aff. ¶¶ 44–45).

In all, Min left KAAGNY to foot bills totaling $301,959.94 (PX9), which rose to $319,095.56, including $61,106.33 in fees and accrued interest, by May 11, 2016, the date on which KAAGNY ultimately paid off the main portion of the debt. Specifically, according to a 60-Day Notice of Intention to Sell Tax Liens, dated March 10, 2016 (eleven days before Kim took over from Min), KAAGNY owed the New York City Department of Finance ("NYCDF") $231,604.90 in overdue property taxes and miscellaneous property-related charges, plus interest that was projected to reach $44,248.07 by May 11, 2016. (PX25.) The due dates for the individual property taxes ranged from January 1, 2014 to January 1, 2016; the first significant tax bill, for $28,067.94, was due on January 1, 2015, and had accrued approximately $20,000 in interest in the nearly sixteen months that had elapsed before Kim assumed office and discovered it. (*Id.* at 3; Tr. 182:1–183:7.) In addition, as reflected in an itemized receipt of payments KAAGNY made to NYCDF on April 29, 2016 ($50,000) and May 11, 2016 ($245,956.23) to satisfy its property-related debt, KAAGNY owed NYCDF "RPIE Non-Filing Fees" – fees apparently imposed for failing to file required "Real Property

6

Income and Expense" statements – totaling $20,147. (PX27 (listing payment of $15,147 for an RPIE Non-Filing Fee issued on September 3, 2013, and two payments totaling $5,000 for an RPIE Non-Filing Fee issued on January 1, 2015); *see also* PX28 at 13 (listing RPIE - 2012 Non-Filing Fee for $15,147.00, due July 1, 2014); *id.* at 25 (listing RPIE - 2014 Non-Filing Fee for $5,000.00, due January 1, 2016).) *See generally* Guide to Understanding the Penalty for Failure to File the Real Property Income and Expense Statement (the "RPIE"), NYC Dep't of Finance (rev. Jan. 18, 2017), https://www1.nyc.gov/assets/finance/downloads/pdf/rpie/rpie_penalty_info.pdf. Finally, Min also left KAAGNY with several non-NYCDF debts totaling $23,384.33, including $3,105 owed to the law firm of Cornicello, Tendler & Baumel-Cornicello, LLP; approximately $2,700 to the Korea Times and $2,000 to the Korean NY Daily for advertisements related to the impeachment and reelection campaign; and $8,000 to TL Engineering, PC. (PX9.)

Upon taking over from Min, Kim discovered that the KAAGNY building would soon be subject to lien foreclosure if the property-related debt were not paid, and thus she quickly raised funds from the Korean-American community to pay that debt. (Kim-Beague Aff. ¶¶ 15–17; (Tr. 41:12–42:11, 104:22–105:1.) In particular, Kim used funds she raised from the Korean-American community to satisfy the property-related debt by making two payments to NYCDF, the first for $50,000 on April 29, 2016, and the second for $245,956.23 on May 11, 2016. (PX26–27; Tr. 40:4–17.) By paying back some of KAAGNY's debt on April 29, 2016, Kim slightly lowered the accrued interest from the projected figure of $44,248.07 (PX25) to $43,959.33 (*see* PX25, 27). KAAGNY also used the community fundraiser to pay the remaining non-NYCDF debts, totaling $23,384.33, that Min had not satisfied by the time he left office. (Tr. 104:22–105:1, 106:5–7; PX9.) Nevertheless, because KAAGNY had to raise funds for these purposes, its ability to raise funds for other purposes was impaired. (*E.g.*, Tr. 106:15–107:7 (Question: "And in your experience is there an unlimited supply of funds out there to be raised through donations?" Kim: "No." . . . Question: "[B]ecause Mr. Min didn't pay personally as he was required to do, you were forced to fundraise?" Kim: "Of course." Question: "By fundraising [to] cover the debt that he owed, did that limit your capacity to fundraise in general for other purposes?" Kim: "Yes.").)

IV. JURISDICTION

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Min is a New Jersey citizen, KAAGNY's principal place of business is in New York, and the amount in controversy exceeds $75,000. Venue is proper in the Southern District of New York because "a substantial part of the events . . . giving rise to [KAAGNY's] claim[s] occurred" in Manhattan. 28 U.S.C. § 1391(b)(2).

V. CONCLUSIONS OF LAW

As noted above, KAAGNY alleges the following three claims for damages under New York law: (1) breach of contract, (2) breach of fiduciary duty, and (3) conversion.[3] (Compl. at 5–7; *see also* Doc.

---

[3] Because all of the events giving rise to this diversity action occurred in New York City and the parties' summations rely exclusively on New York authorities (Doc. Nos. 61–64), the Court applies New York law. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)).

No. 62 at 5–16.) The Court addresses each claim in turn.

### A. Breach of Contract

To prevail on a breach of contract claim under New York law, a party must prove "(1) the existence of a contract between itself and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages to the plaintiff caused by [the] defendant's breach." *Diesel Props S.R.L.*, 631 F.3d at 52. Here, KAAGNY argues that Min breached his contractual obligations under the Campaign Affidavits and incorporated Bylaws by allowing the Association's debt to pass to his successor (Kim), causing damages in the full amount of that debt plus interest that accrued while KAAGNY was raising funds in order to pay off the debt. (Doc. No. 62 at 15–16.) In response, Min argues that there is no contract between the parties because there was no consideration for Min's purportedly "gratuitous" promises in the Campaign Affidavits (Tr. 16:3), and even if there was a contract that Min breached, KAAGNY suffered no damages, since third-party donors covered KAAGNY's debt in full (Doc. No. 61 at 4–6). For the reasons that follow, the Court concludes that Min breached his contractual obligations to KAAGNY, resulting in damages in the amount of $319,095.56.

#### 1. Existence of a Contract

Min argues that KAAGNY has not satisfied the first element of a breach-of-contract claim – the existence of a contract between the parties – because the Campaign Affidavits imposed "[n]o reciprocal obligation on [KAAGNY] and there is therefore a failure of consideration." (*Id.* at 5.)

To establish the existence of a contract, "a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (1st Dep't 2009). The element in dispute here, consideration, need not take the form of mutual promises. "A fundamental tenet of the law of consideration is that consideration may consist *of a performance* or of a return promise, and that, except in certain circumstances not relevant here, any performance which is bargained for is consideration." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 253 (2d Cir. 2019) (internal quotation marks, citations, and brackets omitted) (quoting Restatement (Second) of Contracts §§ 71, 72); *see also Ingrassia v. Shell Oil Co.*, 394 F. Supp. 875, 882 (S.D.N.Y. 1975) (explaining that, under New York law, "[a] unilateral contract consists of an offer or promise to do something in exchange for an act," the acceptance of which "is effected by the performance of the act in accordance with the offer").

Here, Min plainly received a bargained-for performance in return for the promises he made in the Campaign Affidavits. In return for Min's promises that he would undertake certain financial obligations – including, in particular, the obligation to be responsible for all financial liabilities incurred during his term and not to pass such liabilities on to his successor (PX1 at 27–28, 31; PX2 at 2, 5; PX4) – KAAGNY deemed Min eligible to run in the presidential elections. (*See, e.g.*, Kim Aff. ¶¶ 11–15, 23.) In the language of contract law, the consideration for Min's promises in the Campaign Affidavits was KAAGNY's own performance under the contract, which consisted of allowing Min to participate in the elections; when KAAGNY rendered such performance, it thereby accepted Min's offer to abide by his financial obligations in

8

the event he was elected, and a contract between the parties was formed. *See, e.g., Doctor's Assocs.*, 934 F.3d at 253.

### 2. KAAGNY's Performance and Min's Breach

Min does not seriously dispute that, if the Campaign Affidavits formed part of a binding contract between him and KAAGNY, then the second and third elements of KAAGNY's breach-of-contract claim – namely, KAAGNY's performance and Min's breach – are satisfied. Nor could he. As discussed above, KAAGNY performed under the contract by allowing Min to run in the 2013 and 2015 elections, thus satisfying the performance element. As to the breach element, Min breached his binding promises in the Campaign Affidavits by allowing KAAGNY's debt to pass to his successor. Although Min's term ended prematurely through impeachment, the relevant financial obligations in the Bylaws, as restated and incorporated in the Affidavits (PX2 at 2,5; PX4), do not contain any express exceptions (*see* PX1 at 28, 31; Tr. 83:18–84:5). Nor is there any other evidence in the record to suggest the existence of an "impeachment exception" to the president's duty to assume the Association's financial obligations. Moreover, the Court is especially disinclined to infer the existence of such an exception here, since Min remained in office for over a year after being impeached, during which time he knew that he faced the prospect of personal liability if he passed debt to his successor and yet used his de facto powers to pay lawyers to fight his impeachment rather than to reduce KAAGNY's debt (and thus his own liability). On this record, elements (2) and (3) of KAAGNY's breach-of-contract claim are satisfied.

### 3. Damages Causation

Min finally argues that any breach of contract did not cause KAAGNY to incur damages because KAAGNY ultimately satisfied the debt that he left it by raising the necessary funds through community fundraising. (Doc. No. 61 at 5.) Consistent with the evidence at trial, KAAGNY does not dispute that it ultimately paid Min's debt in full (Tr. 106:5–7), but argues that, because Min forced KAAGNY to raise funds in the community to pay a debt for which he was personally responsible, Min essentially "deprived KAAGNY of contributions it would otherwise have had to run its office and its programs" (Doc. No. 63 at 5). The Court agrees with KAAGNY.

"Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). In keeping with this principle, New York recognizes the "lost volume" theory of contract damages. *See Donald Rubin, Inc. v. Schwartz*, 594 N.Y.S.2d 193, 194–95 (1st Dep't 1993). Under the lost volume theory, where an injured plaintiff "mitigates" its damages by entering into a subsequent transaction that the plaintiff would have entered into anyway, the defendant who breached the contract is not entitled to a reduction in damages for mitigation, since the plaintiff has "lost volume" – that is, the plaintiff has been deprived of having the benefit of both transactions. *See id.* (citing Restatement (Second) of Contracts § 347); *see also In re 375 Park Ave. Assocs., Inc.*, 182 B.R. 690, 698 (Bankr. S.D.N.Y. 1995) (recognizing that the lost volume doctrine is a "well[-]settled exception to the duty to mitigate"). Thus, for example, "if a charity solicits money on an annual basis, a donation in one year will not compensate the

charity for a donation 'lost' in a prior year as a result of a defendant's misconduct" because "[h]ad it not been for the misconduct, the charity would have received contributions in both years." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1236 (D.C. Cir. 1997) (applying general contract law principles).

Here, KAAGNY "lost volume" because, although it was able to cover Min's debt by holding an emergency fundraiser, in doing so it lost the benefit of raising those funds for other purposes. As Kim testified at trial, and as common-sense would dictate, there is not an unlimited source of funds in the Korean-American community. (Tr. 41:21–42:3, 107:4–11.) Thus, every dollar raised to cover the debt that Min left for Kim when he finally yielded the presidency was a dollar that could have been used for other purposes. Although Min perhaps could have conducted the same fundraiser while he was in office, he in fact failed to do so, and short of accessing some other source of funds, he was ultimately required to cover the debt with his personal finances.

Thus, with respect to the amount of damages, it is clear that Min's breach of contract caused KAAGNY to incur damages of at least $301,959.94, the amount of debt on KAAGNY's books when Min stepped down as president on March 21, 2016. (PX9.) In addition, because KAAGNY may recover consequential damages for all "reasonably foreseeable" losses proximately caused by Min's breach, *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 193 (2008), KAAGNY is entitled to recover interest that accrued on the overdue property taxes between March 21 and May 11, 2016, the date on which KAAGNY finally satisfied Min's property-related debt. Although such interest accrued after Min left office, it was reasonably foreseeable that KAAGNY would not be able to pay Min's debt immediately, but rather would need some (reasonable) amount of time – here, under two months – to discover the debt and raise funds in the community, leading to the accrual of additional interest. All told, Min's breach of contract therefore caused KAAGNY to expend $295,711.23 in funds raised from the community to pay property-related taxes, charges, fees, and interest. (PX26–27 (payments totaling $295,956.23).)[4] And Min's breach also caused KAAGNY to raise funds to pay $23,384.33 for the remaining miscellaneous debts on its books when Min left office. (PX9.) In sum, as a result of Min's breach and KAAGNY's resulting need to raise funds to cover Min's debt, KAAGNY was deprived of $319,095.56 in community funds that it could have raised for other purposes. Accordingly, the Court concludes that KAAGNY has carried its burden of proving its breach-of-contract claim, and that it is entitled to $319,095.56 in damages.[5]

---

[4] KAAGNY appears to concede that two small payments that are listed in PX27 but not in PX25 – $45 for building signs and $200 for the building elevator – were not due until after Min left office. (*See* Doc. No. 62 at 3 (claiming $295,711 in property-related damages, approximately $245 less than the $295,956.23 that KAAGNY paid NYCDF).) Accordingly, these amounts are not included in the property-related contract damages of $295,711.23.

[5] In its Complaint, KAAGNY sought contract damages "in an amount *not less than* $314,242." (Compl. at 8 (emphasis added).) Although KAAGNY again requested $314,242 in contract damages in summation, the Court notes that KAAGNY's calculation (Doc. No. 63 at 2) omits certain debts listed in PX9 and does not add up to $314,242; more generally, KAAGNY has claimed different property-related contract damages at different times throughout this case (*compare* Compl. ¶ 16 ($290,858) *with* Doc. No. 63 at 2 ($295,711)), and has submitted exhibits that appear to support slightly different numbers (*see* PX9, 24, 25, 27, 29; Kim-Beague Aff. ¶ 13). As explained in the text herein, having considered all of these exhibits, the

### B. Breach of Fiduciary Duty

KAAGNY next claims that Min breached his fiduciary obligations by mismanaging KAAGNY's finances. (Doc. No. 62 at 5–14.) To prevail on this claim, KAAGNY must prove "(1) the existence of a fiduciary relationship, (2) misconduct by [Min], and (3) damages directly caused by [Min]'s misconduct." *Village of Kiryas Joel v. County of Orange*, 43 N.Y.S.3d 51, 57 (2d Dep't 2016) (internal quotation marks and citations omitted). Here, it is undisputed that the first element is satisfied because a fiduciary relationship existed between Min and KAAGNY while Min was president of KAAGNY, including after his impeachment while he continued to hold himself out as president and exercise the powers of the office. (Doc. No. 61 at 7.) *Cf. Schneiderman ex rel. People v. Lower Esopus River Watch, Inc.*, 975 N.Y.S.2d 369, 2013 WL 3014915, at *25 (Sup. Ct. 2013) ("A *de facto* officer has the same fiduciary duties to a charity as its named officers."). The parties, however, dispute (1) whether Min's actions rose to the level of "misconduct," that is, a breach of his fiduciary duties, and if so, (2) whether any such breach caused KAAGNY to incur damages. The Court will address the elements of misconduct and damages causation in turn.

### 1. Misconduct

As part of his fiduciary relationship with KAAGNY, Min owed KAAGNY, *inter alia*, a duty of care. *See In re Perry H. Koplik & Sons, Inc.*, 499 B.R. 276, 289 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 43 (2d Cir. 2014). "The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances." *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984). This duty is "subject . . . to the business judgment rule, which bars judicial inquiry into actions of corporate [officers] taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *In re Perry H. Koplik & Sons*, 499 B.R. at 289 (internal quotation marks omitted); *see* N.Y. Bus. Corp. Law § 715(h).

Here, the gravamen of KAAGNY's claim is that Min breached the duty of care by misappropriating building account funds for non-building expenses, and relatedly, failing to pay KAAGNY's property taxes. (Doc. No. 62 at 6–12.) The Court again agrees with KAAGNY.

As to misappropriation, the Court concludes that "no reasonably prudent" person in Min's position – that is, no reasonably prudent KAAGNY president – would have used the building account funds for non-building expenses in the manner evidenced at trial. *Norlin Corp.*, 744 F.2d at 264. Min transferred a total of $302,957.37 from the building account to the operating account over a series of fifty-four wire transfers between July 2014 and January 2016 to pay for routine operating expenses, such as the $60,000 gala he threw in January 2015, and then withdrew an additional $70,000 from the building account to pay

---

Court finds that contract damages in the amount of $319,095.56 are justified based on KAAGNY's legal theory and the evidence at trial, specifically, PX9, 25, and 27, notwithstanding KAAGNY's request for a lower amount of contract damages. *See, e.g., Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 542, 542 n.20 (9th Cir. 2018) (holding, based on the record and appellant's legal theory, that appellant was entitled to monetary relief in an amount higher than the specific amount he requested); *cf.* Fed. R. Civ. P. 54(c) (providing that a *default judgment* may not exceed the amount demanded in the pleadings).

lawyers in connection with the election and impeachment disputes, including $50,000 after he was properly impeached. (*See* PX7 at 91, 126, 157, 171, 199, 223, 237, 251, 265–66, 279–80, 295, 309, 321, 333–34; Kim Aff. ¶¶ 57–62; Kim-Beague Aff. ¶¶ 23–36, 38–41.) Although Min initially attempted to justify these transfers and expenditures by claiming that former KAAGNY presidents had used the building account to pay for non-building expenses, he acknowledged that such a practice was reserved for "emergency" situations and that former presidents would replenish the funds after using them. (Tr. 149:12–19, 152:5–22.) Even if such a customary exception existed, Min did not use the building account funds to pay for emergencies, nor did he replenish the building account after withdrawing from it.

Min cannot take refuge in the business judgment rule. Arguably the business judgment rule does not apply at all in these circumstances, since Min's use of the building account funds for non-building expenses violated a recognized customary rule concerning the scope of his authority as KAAGNY president. *Cf. Att'y Gen. of N.Y. v. Lutheran Care Network, Inc.*, 92 N.Y.S.3d 154, 159 (3d Dep't 2018) (explaining that the business judgment rule "has no place where corporate officers or directors take actions that exceed their authority under the relevant corporate bylaws"). But even assuming the business judgment rule applies generally, it does not shield Min from liability, since the payment of routine operating expenses was not a "legitimate business purpose" of building account funds. *See Brassco, Inc. v. Klipo*, No. 99-cv-3014 (PAC), 2006 WL 223154, at *18 (S.D.N.Y. Jan. 27, 2006) (holding that the business judgment rule did not protect conduct that "departed from customary norms to an extreme degree"). Because Min repeatedly and unreasonably used building account funds for an illegitimate purpose, he clearly breached his duty of care.

Min also acted unreasonably and without a legitimate business purpose by not paying the property-related bills, several of which were due and owing for over a year at the time he left office in March 2016. (PX.25.) It bears noting that, of course, Min had the discretion to prioritize certain expenses over others. In this regard, Min testified that he used the building account funds to cover operating expenses such as the $60,000 gala, instead of the overdue property taxes, because "[i]t's okay to pay the taxes a little late[,] [b]ut when you have an event, you have to make sure you do it on time." (Tr. 162:17–18.) Nevertheless, even if it could be argued that there was a legitimate business reason for delaying the payment of property-related expenses for a "little" while, there was no legitimate reason for failing to pay them through March 2016, by which time the overall property-related bill had ballooned to almost $300,000, including thousands of dollars in accrued interest, prompting the City to threaten foreclosure. (Kim-Beague Aff. ¶ 15; PX9, 25, 27.) In short, Min's failure to pay property expenses that were due and accruing interest for months – and for several of the bills, over a year (PX25) – constituted a clear breach of the duty of care.

Finally, the Court construes KAAGNY's breach-of-fiduciary-duty claim as encompassing the argument that Min acted improperly by exposing KAAGNY to "RPIE Non-Filing Fees," since such fees are listed in PX27 and 28 and KAAGNY seeks to recover property-related damages based on the fact that it had to pay these fees (which it incorrectly characterizes as "interest") to NYCDF. Given that these fees appear to be the result of Min's failure to file required tax forms, and there is no legitimate business purpose for not filing

such forms, the Court concludes that Min breached his fiduciary duties to KAAGNY by allowing it to incur $20,147 in RPIE Non-Filing Fees.[6]

2. Damages Causation

As to the final element of its breach-of-fiduciary-duty claim, KAAGNY argues that Min's misconduct caused it to incur $425,711 in damages, calculated as follows: (1) $295,711 to cover the amount of the overdue property expenses, or, at a minimum, $64,105 in claimed interest on the property expenses ($1.33 less than the $43,959.33 in interest plus $20,147 in RPIE non-filing fees discussed *supra* pp. 6–7, presumably due to a rounding error); (2) $60,000 that Min transferred from the building account to the operating account to pay for the January 2015 gala; and (3) $70,000 in funds used to pay lawyers in connection with the impeachment and Article 78 proceedings. (Doc. Nos. 62 at 3; 63 at 1–2.) The thrust of Min's response is again that KAAGNY mitigated any damages caused by his misconduct because KAAGNY raised funds in the community to cover the overdue property taxes, and that Min's use of the building account funds to pay for operations, even if improper, in fact benefited KAAGNY. (Doc. Nos. 61 at 1, 7; 64 at 4.) *See* Restatement (Second) of Torts § 920 (1979) ("When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."). The Court will address each of KAAGNY's three damages claims in turn.

***Overdue property taxes.*** KAAGNY first argues that Min's misconduct caused it to incur damages equal to the amount of the overdue property expenses. To be sure, there is a causal connection between Min's misconduct and the overdue property expenses that KAAGNY was required to pay by raising funds in the community. By improperly transferring $302,957.37 from the building account to the operating account, Min drained the building account of funds that would have been used to pay the overdue property expenses. (*See* PX7 at 91, 126, 157, 171, 199, 223, 237, 251, 265–66, 279–80, 295, 309, 321, 333–34; *see also* Kim-Beague Aff. ¶¶ 23–36.) In addition, Min's unreasonable failure to pay those expenses resulted in the accrual of unnecessary interest, and Min's unreasonable failure to file necessary tax forms resulted in the assessment of RPIE non-filing fees.

Furthermore, the Court rejects Min's argument that KAAGNY mitigated all of its damages from the overdue property expenses through the community fundraiser. Because a claim for breach of fiduciary duty sounds in tort, *see 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 217 (S.D.N.Y. 2015), the collateral source rule, as modified by New York statute, prevents the Court from considering "[v]oluntary charitable contributions received by [KAAGNY] to be a collateral source of payment . . . to reduce the amount of any award [or] judgment," N.Y. CPLR

---

[6] KAAGNY also argues that Min engaged in self-dealing through a "secretive scheme to purportedly lease [the KAAGNY building] for a 99-year term." (Doc. No. 62 at 12–13.) However, KAAGNY does not argue that such a scheme caused it to incur damages. (*Id.* at 13–14; *see also* Tr. 264:9–10 (conceding that the lease deal "didn't cause damage").) Because the lease deal therefore cannot serve as the basis for a successful breach-of-fiduciary-duty claim, the Court need not consider whether Min engaged in misconduct in relation to the lease deal.

§ 4545(b); *see Andino v. Mills*, 31 N.Y.3d 553, 560–63 (2018). In addition, even if § 4545(b) did not preclude consideration of the funds raised in the community, such funds would still not constitute mitigation due to the lost-volume problem discussed above.

Nevertheless, the Court agrees with Min that his transfer of building account funds to the operating account, even if improper, ultimately benefited KAAGNY to the extent those funds were used to pay for some bona fide operating expenses. *See* Restatement (Second) of Torts § 920. KAAGNY does not dispute that Min spent most of the misappropriated funds on such operating expenses. And while KAAGNY *does* assert that Min unreasonably paid for certain advertisements ($88,935), personal meals and entertainment ($20,750), and the January 2015 gala ($60,000), the evidence at trial did not bear out these assertions. KAAGNY presented no evidence that Min used $88,935 to finance a personal advertising campaign (Compl. ¶ 21), and indeed, the advertisement campaign is mentioned nowhere in KAAGNY's summation papers (*see* Doc. Nos. 62–63). As for the $20,750 that Min allegedly spent on "meals and entertainment for personal purposes" (Compl. ¶ 21), Kim-Beague acknowledged at trial that such expenses were in fact used to pay for meetings at which KAAGNY members were present (Tr. at 222:13–223:24). Similarly, KAAGNY failed to establish that the January 2015 gala – on which Min spent $60,000 that he previously transferred from the building account to the operating account – was something other than a bona fide, if perhaps ill-advised, KAAGNY event. In sum, although KAAGNY disputes the wisdom of Min's operational expenditures, the record does not support the conclusion that Min used KAAGNY's operating account on personal expenses or otherwise in a manner that failed to benefit KAAGNY.[7]

Although Min is therefore correct that KAAGNY's damages from the unpaid property taxes are largely mitigated by the corresponding increase in funds in KAAGNY's operating account, Min's unreasonable failure to pay KAAGNY's property expenses, as noted above, caused KAAGNY to incur unnecessary interest. This unreasonable delay provided no corresponding benefit to KAAGNY. While Min claims that his failure to pay the property taxes benefited KAAGNY by allowing him to pay for certain operating expenses that KAAGNY could not otherwise afford, Min had an obligation as KAAGNY president to pay for those operating expenses by raising funds in the community, or by using his personal finances, rather than by raiding the building account. His decision to pursue neither of those options, while instead delaying payment of the overdue property expenses, provided no benefit to justify mitigation of the $43,959.33 in accrued interest on those expenses. (PX25.) Similarly, Min's unreasonable failure to file necessary tax forms caused KAAGNY to incur RPIE non-filing fees totaling $20,147, with no offsetting benefit. Thus, the Court agrees with KAAGNY's alternative argument that Min's misconduct caused it to incur $61,106.33 in damages in accrued interest and late fees.

---

[7] This mitigation analysis does not apply to KAAGNY's breach of contract claim because Min's breach of contract was his failure to cover KAAGNY's debt with his personal expenses – a failure that had no corresponding benefit to KAAGNY – whereas Min's fiduciary misconduct consists of his misuse of building account funds, which, while a clear violation of KAAGNY custom, was still mostly undertaken for KAAGNY's operational benefit.

14

***January 2015 gala.*** The Court rejects KAAGNY's claim that Min's misconduct caused KAAGNY to incur $60,000 in damages corresponding to the amount of funds Min expended on the January 2015 gala. As explained above, the $60,000 at issue was part of the overall $302,957.37 that Min improperly transferred from the building account to the operating account to pay for bona fide KAAGNY operations. (PX7 at 157.) As also explained above, KAAGNY has failed to prove that any of these misappropriated funds – including the $60,000 transferred to the operating account to pay for the gala – were used in a way that did not benefit KAAGNY.

***$70,000 in legal expenses.*** In addition to the $302,957.37 that Min improperly transferred from the building account to the operating account, Min improperly withdrew $70,000 directly from the building account to pay lawyers in connection with the impeachment and Article 78 proceedings. Applying the same mitigation framework as above, the Court must determine whether and to what extent those legal services, although improperly funded, benefited KAAGNY. At a minimum, the $50,000 that Min expended on legal services after he was properly impeached on March 31, 2015 provided no benefit to KAAGNY, since litigating the propriety of the impeachment and Article 78 proceedings at that point merely delayed the transition of power between the Min and Kim administrations. Although Min may have believed in good faith that he could overturn the impeachment, he ran the risk that, by continuing to use KAAGNY's funds in an attempt to maintain power even after he was impeached, he would later be held personally responsible for such payments in the event the impeachment were upheld as proper in court. *See* Restatement (Third) of Agency § 8.09 cmt. b (2006) ("Once a relationship of agency has terminated, the former agent has a duty to the former principal to cease acting or purporting to act as that principal's agent."); *see also id.* § 6.05 cmt. b ("[A] principal is not a party to a contract when the agent who enters into the contract on the principal's behalf acts without actual or apparent authority.").

It is a closer question whether Min's payment of $20,000 to Marc S. Bresky of the Bresky Law Firm, PLLC on March 20, 2015, eleven days before the impeachment, provided KAAGNY with a benefit that may be considered in mitigation. Although these legal services ultimately did not prevent the impeachment or consequent transition of power, they arguably still benefited KAAGNY – which was named as a defendant, together with Min, in the Article 78 proceedings – at the time the legal services were purchased. Given the dearth of evidence in the record as to the specific nature of these legal services and the fact that there were facially legitimate reasons for KAAGNY and its undisputed president, both parties in a lawsuit, to retain counsel in March 2015, the Court concludes that KAAGNY has not met its burden of showing damages causation with respect to these pre-impeachment legal services. *See Fed. Ins. Co. v. Mertz*, No. 12-cv-1597 (NSR) (JCM), 2016 WL 164618, at *2–4 (S.D.N.Y. Jan. 12, 2016) (burden of proving damages to a reasonable degree of certainty, caused by a breach of fiduciary duty, remains with plaintiff).

Accordingly, the Court concludes that Min's improper use of the building account funds to pay for legal services caused KAAGNY to incur damages in the amount of $50,000.

***Total damages for breach of fiduciary duty.*** For the foregoing reasons, the Court concludes that KAAGNY has carried its burden of proving that Min breached his

fiduciary duties to KAAGNY, causing KAAGNY to incur damages in the amount of $104,106.33, corresponding to $64,106.33 in late fees and interest on the overdue property taxes plus $50,000 in post-impeachment payments to lawyers in connection with the impeachment and Article 78 proceedings. But as explained above, KAAGNY is also entitled to recover contract damages to cover the property-related debt – including interest and fees – that Min wrongfully failed to pay before leaving office. Because KAAGNY may not recover twice for the same interest and fees, *see Cohen v. Lizza*, 404 N.Y.S.2d 600, 601 (1st Dep't 1978), its net damages on the breach-of-fiduciary duty claim are limited to $50,000.

C. Conversion

Under New York law, a plaintiff must prove the following to succeed on a conversion claim: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016) (internal quotation marks omitted); *see also Goldstein v. Guida*, 904 N.Y.S.2d 117, 119 (2d Dep't 2010) ("Conversion is defined as an intentional act of domination or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the . . . full value of the chattel." (internal quotation marks omitted)). Here, KAAGNY claims that Min converted $70,000 from KAAGNY's building account funds to pay for legal expenses relating to the impeachment and Article 78 proceedings. (Doc. No. 62 at 14–15.) For reasons similar to those discussed in the context of Min's fiduciary duties, the Court concludes that Min converted $50,000 of the $70,000 in building account funds at issue.

First, $70,000 in funds taken from KAAGNY's building account to pay lawyers in connection with the impeachment and Article 78 proceedings constitutes a "specific identifiable thing." *See Eldesouky v. Aziz*, No. 11-cv-6986 (JLC), 2014 WL 7271219, at *14 (S.D.N.Y. Dec. 19, 2014) ("In New York, the funds of a specific, named bank account are sufficiently identifiable for purposes of a conversion claim." (internal quotation marks and brackets omitted)). As to the second element, there can be no serious dispute that KAAGNY owned the funds in its building account before they were transferred to lawyers. Finally, the third element is satisfied for the post-impeachment payments, because Min had no authority over the building account after he was properly impeached and his transfer of the funds at issue seriously interfered with KAAGNY's ownership rights; however, this element is unsatisfied for the pre-impeachment payment, since at that time Min's exercise of "dominion over the [building account funds]" was within his authority as KAAGNY president. *Apple Mortgage*, 162 F. Supp. 3d at 284.

Thus, KAAGNY has carried its burden of proving that Min converted $50,000 from the building account to pay for legal expenses in connection with the impeachment and Article 78 proceedings. However, because KAAGNY cannot recover twice for its loss of $50,000 from the building account, which is also recoverable through its breach-of-fiduciary-duty claim, KAAGNY may only recover a net total of $50,000 for both that claim and its conversion claim.

## VI. Conclusion

For the foregoing reasons, the Court concludes that KAAGNY has carried its burden of proving that Min (1) breached his contractual obligations under the Campaign Affidavits and incorporated Bylaws, (2) violated his duty of care to KAAGNY by repeatedly misappropriating building account funds for non-building purposes, failing to pay overdue property taxes, and failing to file necessary tax forms, and (3) converted building account funds by paying for legal services after he was impeached. Min's breach of contract caused KAAGNY to incur damages equal to the amount of the outstanding debt (including subsequently-accrued interest) that he failed to cover personally, $319,095.56, and his breach of fiduciary duty and conversion caused KAAGNY to incur an additional $50,000 in damages for post-impeachment legal services.

Accordingly, IT IS HEREBY ORDERED THAT, no later than January 17, 2020, KAAGNY shall submit a proposed judgment pursuant to Federal Rule of Civil Procedure 58, which shall include a proposed amount of prejudgment interest pursuant to N.Y. C.P.L.R. §§ 5001, 5004. Min may respond to the proposed judgment no later than January 31, 2020.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: January 3, 2020
    New York, New York

\* \* \*

Plaintiff Korean American Association of Greater New York, Inc. is represented by Charles M. Yoon of Yoon LLP, 11 East 44th Street, Suite 1001, New York, New York 10017, Steven Yudin of the Law Offices of Bernard D'Orazio & Associates, P.C., The Legal Studio @ 238 West 139th Street, New York, New York 10030, and Bernard D'Orazio of the Law Offices of Bernard D'Orazio & Associates, P.C., 100 Lafayette Street, Suite 601, New York, New York 10013.

Defendant Sung Ki Min is represented by Nolan Klein and Hector Ramirez of the Law Offices of Nolan Klein, 39 Broadway, Suite 2250, New York, New York 10006.